573 So.2d 716 (1990)
Donald Eric GARDNER
v.
STATE of Mississippi.
No. 07-KA-59290.
Supreme Court of Mississippi.
December 19, 1990.
B. Calvin Cosnahan, II, McComb, for appellant.
Mike C. Moore, Atty. Gen., Wayne M. Snuggs, Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and BLASS, JJ.
DAN M. LEE, Presiding Justice, for the Court:

I.
On the evening of July 4, 1987, at a nightclub in Pike County, Donald Eric Gardner [Gardner] had the occasion to use his fists and physically strike Billy John Hart [Billy John] several times. As a result of these strikings every bone in Billy John's face was broken and/or crushed, his eyeballs were pushed back into his sinuses, his nose was broken and shoved into the skull approximately 2 inches so that it lay directly under the brain within the skull, and his upper jaw was completely separated from his upper skull. Gardner was charged with, and found guilty of, aggravated assault in violation of § 97-3-7[1] and sentenced to 16 years in the custody of the Mississippi Department of Corrections. He appears before us today claiming reversible error based upon the photographs introduced into evidence, the weight of the evidence, and his sentence. We affirm.

II.
Twenty-six year old Billy John is a sometimes-employed pulpwood hauler and dairy farming helper who occasionally works as an informant for Agent Ronnie Frazier of the Mississippi Bureau of Narcotics. On one such occasion Billy John took Agent Frazier to the home of the Mohon brothers, J.D. and Richard, so that Agent Frazier could make a cocaine purchase. As a result of that purchase, both J.D. and Richard were arrested: Richard at home, and J.D. at the home of Gardner's father, Maxie Gardner.
Greta Porter [Greta] is a friend of both Gardner and Billy John. According to Greta, at some time prior to April of 1987, Gardner told her to stay away from Billy John because he was a narc and that some day he would get Billy John. Gardner only admitted talking with Greta and telling her Billy John was a narc.
*717 On the evening of July 4, 1987, Gardner and Billy John wound up at an establishment known as The Topcat; the two men were not together. Billy John was very drunk and does not remember the events of the evening. Testimony of State witnesses and one defense witness indicated that Billy John was a friendly drunk who had spent the evening having a good time and causing only minor irritation to the members of the band and the management. Several defense witnesses testified that Billy John had been "bounced" from the establishment at least twice during the evening in question, but each time he had been allowed to return.
Testimony revealed two (2) versions of what happened between Gardner and Billy John on the evening of July 4, 1987; one version presented by State witness Roland Herring, and one version presented by Gardner himself, corroborated by defense witness, Thomas Jordan, Jr.
State witness Roland Herring [Roland] testified that he was with Billy John immediately before the events which lead to Gardner's indictment. According to Roland, he and Billy John were in the rest-room, Billy John asked for a ride home, but Roland could not oblige because he did not have a car. Roland and Billy John exited the restroom. At this time two (2) men Roland had never seen before walked up to Billy John; both men struck Billy John simultaneously and he fell to the floor. Roland testified that he turned his back on Billy John while he tried to get the two (2) assailants. Roland then heard a friend, Missy Hart, screaming for help, and turned around; he saw Gardner administering repeated blows to Billy John as Billy John lay prone and unconscious on the floor.
Gardner did not see two (2) men hit Billy John. Gardner testified that he was on his way to the bathroom when Billy John grabbed him by the throat and threatened to kill him. It was at this time, according to Gardner, in an effort to get Billy John off him, that Gardner hit Billy John twice, they wrestled while Billy John fell to the floor, and he again struck Billy John twice. Gardner testified that the entire incident took between six (6) and 10 seconds.
Thomas Jordan, Jr. [Thomas], employee of Topcat, testified that he had observed Billy John throughout the evening and had personally removed him from the premises twice for being a nuisance. Thomas was 10-15 yards away from the fight when it occurred. According to Thomas, Billy John grabbed Gardner around the neck, Gardner hit Billy John twice, both men fell to the ground while Gardner continued to hit Billy John, and Gardner hit Billy John two (2) more times once they were on the floor. Thomas also testified that once the men hit the floor, Billy John appeared unconscious and Gardner ceased to hit him.
Another patron, Dennis Bowman, testified that he saw Billy John "go into" Gardner, the two men fall to the floor, and Gardner hitting Billy John two or three times.
Nineteen year old Missy Hart [Missy] was a patron of the Topcat on the evening of July 4, 1987. Missy was present during the altercation and testified to the following: (1) she did not see the beginning of the fight; (2) when she observed the two men, Billy John appeared to be unconscious, lying on the floor with his arms out to the side, and Gardner was over him administering repeated blows, estimated to be approximately eight (8) in number, although not counted. She screamed for help. At this time, according to Gardner, he was grabbed by some bouncers and taken to the bathroom.
Carl Tate, a former co-employee and former roommate of Gardner's, was present at the Topcat on the evening in question. He testified that he had not observed the altercation, but after the altercation he heard, but did not see, Gardner say, "He won't narc on anybody else." Gardner testified that he did not know what, if anything, he said after the altercation, nor did he know what became of Billy John, although he was amazed at the pictures of Billy John.
Deputy Sheriff David McManus arrived on the scene approximately 2:45 a.m. Deputy McManus testified that upon arrival he *718 observed Billy John unconscious, lying on the floor in front of the bandstand, his head and face very swollen. Billy John was taken to the hospital; Deputy McManus remained at the scene to gather information. Later, Deputy McManus attempted to speak with Billy John at the hospital, but was unable to do so because Billy John was still unconscious.
Dr. Will Austin, E.N.T. specialist, examined Billy John immediately after admittance to the hospital. At this time Billy John's eyes were swollen completely shut and his face was very bruised. X-rays revealed that every bone in Billy John's face was broken and/or crushed, his eyeballs were pushed back into his sinuses, his nose was broken and shoved into the skull approximately 2 inches so that it lay directly under the brain within the skull, and his upper jaw was completely separated from his upper skull. In order to allow the facial swelling to recede and to ensure the lack of brain injury, surgery was postponed until July 7, 1987, at which time Billy John underwent a five (5) hour procedure. Billy John spent a total of 11 days in the hospital.

III.
Gardner first complains about six (6) colour photographs of Billy John's face introduced into evidence as State's Exhibit 1 through 6, two (2) of which depict Billy John pre-surgery, four (4) depicting Billy John post-surgery. Following the objections of defense counsel outside the presence of the jury, and immediately prior to the introduction of all six (6) colour photographs into evidence, the trial court made the following ruling:
BY THE COURT: Well, of course, I'll weigh the prejudicial effect as against the probative value of the evidence. I feel that if the evidence goes toward indicating that it was only a simple assault, that would be one thing, the jury might be justified in reducing the charge from aggravated assault to a simple assault, but if the evidence indicates that it was much more severe than simple assault, that there was beating continued after there was no threat to the defendant, and even continued to the point after the victim was rendered unconscious; that might indicate that the assault was aggravated. I think that therefore the severity of the injuries would tend to help the jury decide whether it was simple assault or whether it was assault that was only sufficient to repel an attack, if any, upon the person doing the assaulting, or whether it continued past the point when the victim was conscious and continued to inflict injury when there was no threat to the assaulter, and that would indicate the purposefulness of the assault or to commit aggravated assault. So, I think that the photographs tend to help the jury to understand the testimony of the witness and to aid  more easily see what injuries were done to the victim, and so that they can more readily make the decision as to whether or not the injuries were more severe than would ordinarily be sustained in the repelling of an attack. It is my understanding that the defendant is  because of the Voir Dire examination and the opening statements, it's my understanding the defendant may urge that it was necessary self-defense. So, in anticipating of that I think it would be very important for the jury to determine whether or not it exceeded that. All right. For that reason I'm going to permit the photographs to  I do think that their probative value outweighs the prejudicial effect. All right. Ask the jury to come back in, please.
Of course, the decision regarding the admission of photographs is left to the sound discretion of the trial judge and will not be disturbed by us absent a showing that the trial court abused its discretion in reaching its decision. Sudduth v. State, 562 So.2d 67, 69 (Miss. 1990) and cases cited therein; McNeal v. State, 551 So.2d 151, 159 (Miss. 1989); Stringer v. State, 548 So.2d 125, 134 (Miss. 1989) and cases cited therein. "The mere fact that photographs depict an unpleasant or gruesome scene is no bar to their admission if they are relevant." Lanier v. State, 533 So.2d 473, 484 (Miss. 1988). However, "photographs *719 which are gruesome or inflammatory and lack an evidentiary purpose are always in admissible as evidence." McNeal v. State, 551 So.2d 151, 159 (Miss. 1989) quoting McFee v. State, 511 So.2d 130, 135 (Miss. 1987). We offered trial courts guidance on the issue of gruesome photographs in McNeal v. State, 551 So.2d 151, 159 (Miss. 1989):
[W]e do not presume to conclude that every gruesome photograph admitted into evidence constitutes an abuse of discretion; however, when presented with photographs such as the ones in this case, we caution the trial judge to carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence. More specifically, the trial court must consider: (1) whether the proof is absolute or in doubt as to the identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.
We have reviewed the photographs admitted into evidence in this case and, while not pleasant, they do not rise to the gruesomeness of those in McNeal. Further, unlike the McNeal photographs, the introduction of the photographs in this case were not only relevant, but absolutely necessary to aid the jury in its decision of whether the assault with fists constituted aggravated assault or simple assault. On the basis of the record before us, we hold that the trial court did not err in admitting the photographs into evidence.
We have carefully examined the record in light of Gardner's remaining assignments of error and this Court's standards of review. We find that a detailed discussion of the remaining points of error is unnecessary; suffice it to say that the verdict was not against the overwhelming weight of the evidence, LeFlore v. State, 535 So.2d 68 (Miss. 1988), nor was the sentence excessive, Corley v. State, 536 So.2d 1314 (Miss. 1988); Johnson v. State, 461 So.2d 1288 (Miss. 1984).
CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF 16 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] "(2) A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; ... and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the penitentiary for not more than twenty (20) years."