GRIFFIS, J.,
for the Court.
¶ 1. Robert Kent Hardin was convicted on two counts of burglary of a dwelling, one count of conspiracy to commit burglary of a dwelling, one count of armed robbery, and one count of kidnaping. Hardin was sentenced to serve twenty-five (25) years on count one, burglary of a dwelling, with ten (10) years to serve in the custody of the Mississippi Department of Corrections and the remaining fifteen (15) years on post-release supervision; twenty-five (25) on count two, burglary of a dwelling, with ten (10) years to serve in the custody of the Mississippi Department of Corrections and the remaining fifteen (15) years on post-release supervision; five (5) years on count three, conspiracy to commit the crime of burglary of a dwelling, to be served on post-release supervision; thirty-five (35) years on count four, armed robbery, with fifteen (15) years to serve in the custody of the Mississippi Department of Corrections and twenty (20) years on post-release supervision; five (5) years on count five, kidnaping, to be served on post-release supervision. Hardin’s total sentence resulted in thirty-five (35) years incarceration and the remaining sixty (60) years on post-release supervision. On appeal, Hardin argues that his conviction is not supported by legally sufficient evidence. We affirm.
FACTS
¶ 2. Robert Kent Hardin and Johnny Lee Wallace met at the Hinds County Restitution Center. On March 2, 2002, Hardin and Wallace signed out of the center and went to McDonald’s where Wallace worked. Wallace testified that they had marijuana and that they smoked it on the way to McDonald’s. After Wallace’s shift, they still had marijuana and did not want to return to the restitution center. They went to the bus station and bought tickets to Brookhaven.
¶ 3. When the pair arrived in Brookha-ven, Wallace called a friend to pick them up. Randy King picked the two up at a gas station and took them to his dorm room at Copiah-Lincoln Community College. The following day, King dropped them off at one of Wallace’s friend’s house, somewhere near McComb. Wallace testified that about an hour after they were dropped off he was picked up by another friend, and Hardin’s girlfriend picked him up. According to Wallace’s testimony, he never saw Hardin again. Wallace was then asked:
Q. Do you recall pleading guilty to the crimes of two counts of burglary of a dwelling, conspiracy to commit burglary, armed robbery, and kid-naping?
A. Yes, ma'am.
Q. Did you have counsel at the time of the guilty plea?
A. Yes, ma'am.
*72 [[Image here]]
Q. Mr. Wallace, count three is an indictment for conspiracy. And you just testified that you pled guilty to that. That count of conspiracy says that you conspired with Robert Kent Hardin to commit these crimes, and you pled guilty under oath to that, didn’t you?
A. Yes, I did.
¶ 4. The court then allowed the State to call Investigator Lance Falvey, of the Lincoln County Sheriffs Department, to testify about the statement Wallace gave on April 22, 2002, after he was arrested. This statement was played for the jury and to contradict Wallace’s testimony. In the recorded statement, Wallace gave a very different version of the events.
¶ 5. In Wallace’s recorded statement, he implicated Hardin as his co-conspirator. He gave a detailed account of the burglary, robbery, and kidnaping as well as flight to Mexico. Wallace’s statement contains internal inconsistencies, notably he alternates calling his co-conspirator “Robert” or “Sean.” At Hardin’s trial, Wallace admitted that he gave the statement that implicated Hardin in an effort to get a plea bargain.
STANDARD OF REVIEW
¶ 6. In reviewing a sufficiency of the evidence claim, the Court considers the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844(¶ 16) (Miss.2005). If any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we uphold the verdict. Id. Should the facts and inferences considered in a challenge to the sufficiency of the evidence “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” the proper remedy is for the appellate court to reverse and render. Id. (citing Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).
ANALYSIS
¶ 7. Hardin argues that no prosecution witness ever identified him as the person who was with Johnny Wallace the day the crimes were committed. “The character and adequacy of evidence of identification of an accused in a criminal case is primarily a question for the jury, provided the evidence could reasonably be held sufficient to comply with the requirement of proof beyond a reasonable doubt.” Passons v. State, 239 Miss. 629, 634, 124 So.2d 847, 848 (Miss.1960). Our review of the record reveals that Hardin is incorrect. Indeed, Hardin claims that the prosecution failed to offer any evidence of the identity of the defendant. However, it is clear from the transcript that the prosecution expected Wallace to identify Hardin as his co-conspirator and to connect Hardin to each of the crimes. When Wallace recanted his story, the prosecution was left with a difficult task of proving Hardin’s identity and connection to the crimes without Wallace testifying consistent with his statement to Officer Falvey.
¶ 8. Hardin claims that during trial nine witnesses testified for the prosecution. Investigator Falvey was the only one who was asked to identify Hardin in court. He asserts that there was no in — court identification of Hardin that placed him with Johnny Wallace immediately prior to, during or immediately following the alleged crimes.
¶ 9. The prosecution elicited testimony from the three witnesses who possibly could have identified Hardin. However, their testimony focused on the race, age, physical build and lack of tattoos of the *73 perpetrators. Each witness was asked to describe the perpetrators, and they all described the perpetrators as white males. Each witness testified that one was slightly taller than the other, but of about the same build.
¶ 10. Investigator Lance Falvey testified that Johnny Wallace is five feet nine inches tall and approximately 135 or 140 pounds. Falvey also testified that Hardin is five feet six inches tall and weighs approximately 135 pounds.
¶ 11. Dorothy Featherly, Wallace’s aunt, was the victim of the armed robbery. She testified that she knew Wallace was there. The prosecutor did not ask Ms. Featherly if she could identify the other person who robbed her. Featherly’s testimony did not result in an identification of Robert Hardin as the second perpetrator. Featherly testified that she was robbed by two young men of medium build, who were wearing white tee shirts, black pants and masks covered their faces.
¶ 12. Randy King testified that Johnny Wallace called King to pick him up in Brookhaven on the night Wallace and Hardin left the restitution center. King recalled that he picked Wallace and another person up and was told the other person was named Sean. According to King, Sean was white and built about the same as Wallace, but Sean was shorter than Wallace. King also testified that Sean was a smaller build, and he would describe Wallace as taller and thinner. The prosecutor did not ask King if he could identify Hardin as the person who was with Wallace. King was asked if he noticed any tattoos on Johnny’s friend’s arms. King responded that he did not notice any at all.
¶ 13. The prosecutor did not ask King if he could recognize the person who was with Wallace that night. Even though King possibly could have corroborated the allegation that Robert Hardin was also known as Sean, the prosecutor did not ask King if the person who he picked up and allowed to spend the night in his dorm room was in the courtroom.
¶ 14. Keith Boyd also testified for the prosecution. Keith Boyd lived a short distance from the scene of crimes. Boyd testified that, on the day the crimes were committed, he was awakened at his home and found two young white men at his door. They asked him for a ride to Blisters’ store. Boyd testified that he was not going to take them until one of them offered him one hundred dollars to get them to the store before three o’clock. Boyd then drove the pair to the store.
¶ 15. Boyd saw the faces of both perpetrators very shortly after the crimes occurred. However, the prosecutor did not ask Boyd if he could identify the person that was with Johnny Wallace that day. Boyd was also asked about the race and build of the men, and described them as white, young guys. Boyd did testify that one of them was three or four inches shorter than the other. Boyd was also asked about the presence of tattoos on the forearms of either of them, and he testified that he did not notice any tattoos.
¶ 16. As discussed above, the prosecution called Johnny Wallace to the stand to testify he identified Robert Hardin. However, Wallace testified that Hardin was not the one who committed the crimes with him. The prosecutor then questioned Wallace about his guilty plea, where he identified Robert Hardin as his co-conspirator. The prosecution offered, without objection by the defense counsel, the taped statement given by Johnny Wallace to Investigator Falvey shortly after Wallace was arrested. On this tape, Wallace gives a long statement detailing the events from when he and Hardin left the restitution center until Wallace was arrested. The *74 taped statement implicates Hardin as his cohort, but also refers to “Sean” as the person who committed the crimes with him. The names are used interchangeably.
¶ 17. Hardin argues that the “taped statement is unreasonable, not probable, and substantially impeached. According to the Court, that would render his testimony unusable.” Nason v. State, 840 So.2d 788, 791(¶ 11) (Miss.Ct.App.2003). In Nason, Smith, a co-defendant, was called to testify to identify Nason as the “perpetrator of the crime.” Id. at 790(¶ 7). Nason argued that the testimony was unreliable, self serving and not credible. Id. at (¶ 8). This Court held
Even though Smith’s testimony should be viewed with caution and suspicion, it was the trial judge’s responsibility to weigh the probative value of the testimony versus the prejudicial aspect of the testimony. Even though Smith’s testimony contained inconsistencies, it is the duty of the jury to determine “the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity.” Noe v. State, 616 So.2d 298, 303 (Miss.1993) (citing Jones v. State, 381 So.2d 983, 989 (Miss.1980)).
Furthermore, the testimony of Smith was not uncorroborated. Testimony can be corroborated by either evidence or by other testimony. The State presented at least two witnesses, all of whom testified closely if not exactly to what Smith testified to. As for the testimony being “reasonable, not improbable, self-contradictory or substantially impeached,” Smith’s testimony was well within reason and not improbable. Smith was even warned about this possibility right before he was to testify and was given the chance to back out of testifying. In addition, Nason had an opportunity to cross-examine Smith, which would have enabled Nason to bring to light any inconsistencies, ulterior motives, fear or duress.
Nason, 840 So.2d at 791 (¶¶ 10-11). Na-son does not support Hardin’s argument.
¶ 18. We must first consider the effect of Wallace’s taped statement. Hardin argues that Wallace’s testimony in court is inconsistent with the statement given on the tape, and the recorded statement is internally inconsistent. Wallace’s statement would be considered under the definition of hearsay. It is an out of court statement that is being offered to prove the truth of the matter asserted. However, Mississippi Rule of Evidence 801(d)(1)(A) provides that “[a] statement is not hearsay if: ... The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition.... ” Thus, Wallace’s testimony that he previously pled guilty and as part of the plea testified under oath that he “conspired with Robert Kent Hardin to commit these crimes” is sufficient to identify Hardin as a participant in the crimes.
¶ 19. Next, we must consider the corroborating evidence. “Only slight corroboration of an accomplice’s testimony is required to sustain a conviction.” Young v. State, 425 So.2d 1022, 1024 (Miss.1983). In addition to Wallace’s guilty plea, the following evidence provides corroboration:
1. Wallace met Hardin at the restitution center. They left together without authorization smoked marijuana together, rode the bus to Brookhaven together, and were together the following day at the home of a guy named Wesley.
*75 2. The jury was entitled to consider similar descriptions elicited from Featherly, King, and Boyd concerning the physical features and builds of the two men they encountered.
3. The jury was entitled to consider the similarity of clothing. Hardin wore a 9 ½ size shoe while Wallace wore size 11. There was testimony describing white T-shirts and black pants.
4. The jury was entitled to consider the clothing with Mexican labels and tags which reflected it was either made or purchased in Mexico.
5. The jury was entitled to consider the fact that Hardin was arrested in Laredo, Texas, a border town.
6. The jury was entitled to consider the testimony concerning the gang-related tattoos on the forearms of both Wallace and Hardin which were never noticed by anyone until after the trip to Mexico.
7. The jury was entitled to consider the fact that over $8,000 was taken during the burglaries and the robbery of Featherly. Thus, both men had sufficient funds to travel to Texas and Mexico.
8. The jury was entitled to consider that “Poker” was too non-descriptive to be anything other than a fabrication by Wallace.
9. The jury was entitled to consider Hardin’s abandoned clothing found at the crime scene.
¶ 20. Ordinarily it would be within the jury’s province to determine which statement was most credible. It is for jurors to resolve conflicts in testimony. McGee v. State, 828 So.2d 847, 850(¶ 13) (Miss.Ct.App.2002) (citing Jackson v. State, 614 So.2d 965, 972 (Miss.1993)).
¶21. We find the evidence was sufficient to support Hardin’s conviction. Therefore, we affirm.
¶ 22. THE JUDGMENT OF THE LINCOLN COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I — BURGLARY OF A DWELLING AND SENTENCED TO TWENTY-FIVE YEARS WITH TEN YEARS TO SERVE AND FIFTEEN YEARS OF POST-RELEASE SUPERVISION; COUNT II— BURGLARY OF A DWELLING AND SENTENCED TO TWENTY — FIVE YEARS WITH TEN YEARS TO SERVE AND FIFTEEN YEARS OF POST-RELEASE SUPERVISION; COUNT III— CONSPIRACY TO COMMIT BURGLARY OF A DWELLING AND SENTENCED TO FIVE YEARS OF POST-RELEASE SUPERVISION; COUNT IV — ARMED ROBBERY AND SENTENCED TO THIRTY-FIVE YEARS WITH FIFTEEN YEARS TO SERVE AND TWENTY YEARS OF POST-RELEASE SUPERVISION; . COUNT V KIDNAPING AND SENTENCED TO SERVE FIVE YEARS OF POST-RELEASE SUPERVISION FOR A TOTAL OF THIRTY-FIVE YEARS TO SERVE ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND SIXTY YEARS OF POST-RELEASE SUPERVISION IS AFFIRMED. THIS SENTENCE WILL ALSO RUN CONSECUTIVE TO HIS PROBATION REVOCATION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LINCOLN COUNTY.
KING, CJ., LEE and MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, BARNES, ISHEE and ROBERTS, JJ., CONCUR.